NOT RECOMMENDED FOR PUBLICATION
File Name: 26b0003n.06

# BANKRUPTCY APPELLATE PANEL

## OF THE SIXTH CIRCUIT

IN RE: WEDGEWOOD PROPERTIES, LLC,

*Debtor*.

JEFF A. MOYER, Trustee,

*Plaintiff-Appellant*,

*v.*

CONNIE ROGERS; WILLIAM STEPHEN,

*Defendants-Appellees*.

No. 24-8007

Appeal from the United States Bankruptcy Court
for the Western District of Michigan at Grand Rapids.
Nos. 18-bk-4808; 20-ap-80139—James W. Boyd, Bankruptcy Judge.

Argued:  May 22, 2025

Decided and Filed:  April 22, 2026

Before:  BAUKNIGHT, Chief Bankruptcy Appellate Panel Judge;
GUSTAFSON and MASHBURN, Bankruptcy Appellate Panel Judges.

_____

## COUNSEL

**ARGUED:**  Matthew T. Nelson, WARNER NORCROSS + JUDD LLP, Grand Rapids, Michigan, for Appellant.  Scott F. Smith, SMITH LAW GROUP PLLC, Farmington Hills, Michigan, for Appellees.  **ON BRIEF:**  Matthew T. Nelson, Charles R. Quigg, WARNER NORCROSS + JUDD LLP, Grand Rapids, Michigan, Andrew J. Gerdes, CAPITAL BANKRUPTCY, Lansing, Michigan, for Appellant.  Scott F. Smith, SMITH LAW GROUP PLLC, Farmington Hills, Michigan, for Appellees.

GUSTAFSON, J., delivered the opinion of the panel in which BAUKNIGHT, C.J., and MASHBURN, J., concurred.  GUSTAFSON, J. (pp. 27–29), also delivered a separate concurring opinion.

---

**OPINION**

---

JOHN P. GUSTAFSON, Bankruptcy Appellate Panel Judge.  This appeal arises from an adversary proceeding brought by the chapter 7 Trustee, Jeff A. Moyer ("Trustee" or "Appellant") against Defendant-investors Connie Rogers ("Rogers") and William Stephen ("Stephen") following the collapse of Wedgewood Properties, LLC ("Wedgewood"), a Nevada company managed by now-deceased attorney Shawn Weera ("Weera").  Between 2013 and 2016, Rogers and Stephen invested a total of $635,000 in Wedgewood.  They initiated a state court proceeding against Weera and Wedgewood, asserting claims of conversion and violation of securities laws, and later settled the action for $900,000.  In partial satisfaction of the settlement agreement, Rogers and Stephen recovered $550,000, which was later found to have come from: 1) real property sales and 2) monies invested in Wedgewood by other creditors.  The Bankruptcy Court found[1] that Wedgewood was continuously insolvent, commingled funds, and operated with characteristics of a Ponzi scheme.  The Court found that Rogers and Stephen had received fraudulent transfers; however, the court also found they had established their good faith affirmative defense to avoidance of most of those transfers.  Further, the Bankruptcy Court found that service was sufficient to perfect the Defendants' garnishment 93 days before the bankruptcy filing, taking the transfer of money through garnishment outside the preference period.  Because the Bankruptcy Court's factual finding of good faith is not clearly erroneous, and the garnishment holding is supported by existing case law, the Bankruptcy Court's judgment is **AFFIRMED**.

---

[1] *In re Wedgewood Props., LLC*, 661 B.R. 578 (Bankr. W.D. Mich. 2024).

**ISSUES ON APPEAL**

1.      Did the Bankruptcy Court err when it found that Appellees accepted Wedgewood's actual fraudulent transfers in good faith for purposes of their affirmative defense under Section 548(c) of the Bankruptcy Code?

2.      Did the bankruptcy court err when it held that Michigan's court rule regarding dismissal of improperly served complaints meant that the garnishment was deemed to have been served outside the preference period?

**JURISDICTION AND STANDARD OF REVIEW**

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Western District of Michigan has authorized appeals to the Panel.  Pursuant to 28 U.S.C. § 158(a)(1), a final order of the bankruptcy court may be appealed as of right.  "Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."  *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37, 140 S. Ct. 582, 586 (2020) (citing *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501, 135 S. Ct. 1686, 1691 (2015)).  Orders that "fully dispose of the adversary proceeding" are final. *Church Joint Venture, L.P. v. Bedwell* (*In re Blasingame*), 598 B.R. 864, 868 (B.A.P. 6th Cir. 2019) (citing *Geberegeorgis v. Gammarino* (*In re Geberegeorgis*), 310 B.R. 61, 63 (B.A.P. 6th Cir. 2004) ("[A]n order that concludes a particular adversarial matter within the larger case should be deemed final and reviewable in a bankruptcy setting." (citations omitted))).

The specific types of relief determined in this case are also recognized as creating final orders.  First, orders that fully dispose of fraudulent transfer claims are final.  *See Suhar v. Bruno* (*In re Neal*), 478 B.R. 261, 265 (B.A.P. 6th Cir. 2012) (citing *Lyon v. Eiseman* (*In re Forbes*), 372 B.R. 321, 325 (B.A.P. 6th Cir. 2007) ("A bankruptcy court order which sets aside a fraudulent conveyance pursuant to 11 U.S.C. § 548(a) is a final order for purposes of appeal."), *rev'd on other grounds*, 541 F. App'x 609 (6th Cir. 2013).

Second, orders that fully dispose of a preference claim under 11 U.S.C. § 547(b)(4) are final.  *See Belfance v. Buonpane* (*In re Omega Door Co., Inc.*), 399 B.R. 295, 298 (B.A.P. 6th Cir. 2009) ("The judgment of the bankruptcy court holding that the note payments . . . constituted avoidable preferential transfers under 11 U.S.C. § 547(b) is a final order."); *see also Corzin v.*

*Decker, Vonau, Sybert & Lackey, Co., L.P.A.* (*In re Simms Constr. Servs. Co., Inc.*), 311 B.R. 479, 481 (B.A.P. 6th Cir. 2004) ("The judgment of the bankruptcy court holding that the payment . . . constituted an avoidable preferential transfer under § 547(b) is a final order.").

The Panel "reviews conclusions of law *de novo* and factual determinations . . . under a clearly erroneous standard." *Kraus Anderson Cap., Inc. v. Bradley* (*In re Bradley*), 507 B.R. 192, 196 (B.A.P. 6th Cir. 2014) (citing *Van Aken v. Van Aken* (*In re Van Aken*), 320 B.R. 620, 622 (B.A.P. 6th Cir. 2005)); *see also Miller v. Wylie* (*In re Wylie*), No. 24-1321, 2024 WL 4553297, at *2 (6th Cir. Oct. 23, 2024) ("We review the bankruptcy court's legal conclusions de novo, [] and its factual findings—such as a finding of intent—for clear error, *Barclays/Am. Bus. Credit, Inc. v. Adams* (*In re Adams*), 31 F.3d 389, 393 (6th Cir. 1994)."). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed.'" *In re Wylie*, 2024 WL 4553297 at *2 (citing *United States v. Mathews* (*In re Mathews*), 209 B.R. 218, 219 (B.A.P. 6th Cir. 1997) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985))). Echoing the Supreme Court's holding in *Anderson*, the Sixth Circuit explained the contours of the clearly erroneous standard:

> This standard does not entitle the reviewing court to reverse a factual finding simply because it is convinced that it would have decided the case differently. *Anderson*, 470 U.S. at 573, 105 S. Ct. 1504. If the district court's account of the evidence is plausible in light of the entire record, this court may not reverse that accounting, even if convinced that, had it been sitting as trier of fact, it would have weighed the evidence differently. *Id.* at 574–75, 105 S. Ct. 1504. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be deemed clearly erroneous. *Id.* at 574, 105 S. Ct. 1504. "This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.*

*Harlamert v. World Finer Foods, Inc.*, 489 F.3d 767, 771 (6th Cir. 2007).

Finally, the Panel reviews a federal court's application of state law *de novo*. *Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1088 (6th Cir. 2016) (citing *Matilla v. S. Ky. Rural Elec. Co-op. Corp.*, 240 F. App'x 35, 38 (6th Cir. 2007)). When a state's highest court has not addressed an issue of state law, federal courts are to "predict how the [state's highest] court would rule by looking to all the available data." *Antioch Co. Litig. Tr. v. Morgan*, 644 F. App'x 579, 582 (6th

Cir., 2016) (quoting *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc*., 249 F.3d 450, 454 (6th Cir. 2001)).[2] "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the Michigan Supreme Court would decide otherwise." *Allstate Ins. Co.*, 249 F.3d at 454 (citation omitted).

## FACTS

The Bankruptcy Court held a three-day trial and received testimony from four witnesses. Various exhibits were also admitted into evidence.  Most of the underlying facts do not appear to be in dispute.  Instead, it is the inferences and conclusions that are to be drawn from those facts that are the subject of this appeal.

Debtor was a Nevada company founded in 2002 and managed by Weera.  Initially, it was claimed to be focused on commercial real estate but shifted to currency trading by 2008.  Weera, an attorney, also provided legal and financial elder services to clients, including Rogers and Stephen.

At the time of trial in 2024, Rogers was in her early eighties.  She had a high school education and worked as an executive assistant until her retirement in 2004.  The Bankruptcy Court found Rogers' memory to be sharp and her testimony credible.  Stephen also had a high school education.  He worked as a draftsman in the auto industry prior to his retirement.  At the time of trial, Stephen was ninety-one years old.  The Bankruptcy Court found him to be honest and intelligent but noted that his memory was failing and he had cognitive difficulties.  The Court greatly discounted Stephen's testimony and accorded it almost no weight.

In February 2013, at the suggestion of Weera, Stephen invested $50,000 in Wedgewood. About two years later, the Michigan Department of Licensing and Regulatory Affairs ("LARA") issued a cease-and-desist order against Weera and Wedgewood, and in March 2016, the terms of a settlement were incorporated into an Amended Administrative Consent Order ("Consent Order").  The LARA Consent Order prohibited Wedgewood from accepting investments from new investors for a sixteen-month period.  However, Wedgewood was permitted to continue to receive

---

[2]No party requested that the Panel certify any question(s) regarding state law to the Michigan Supreme Court.

investments from current investors.  In addition, LARA required that Wedgewood make a rescission offer to all investors, allowing them to either continue with their investment in Wedgewood or be repaid all accrued interest and principal.

In March 2016, Stephen invested an additional $100,000 in Wedgewood.  In April 2016, Stephen invested an additional $330,000, and Rogers made her only investment of $155,000.

Weera led Rogers and Stephen to believe that the sale of certain annuities and their Wedgewood investments would not create any tax liabilities.  Rogers and Stephen began to become concerned regarding their investments after receiving a Form 1099 reflecting approximately $400,000 in taxable income in January 2017.  They hired a tax specialist who told them they would owe about $30,000 in taxes.  The tax specialist also stated that Weera had known the full extent of the tax liability from the beginning.  Rogers and Stephens were told they "needed a specialist" and it was suggested that they contact an attorney.  (Opinion Regarding Avoidance and Recovery of Fraudulent Transfers ("Op.") at 14, Adv. P. 20-80139-jwb, ECF No. 150.)

By April of 2017 Rogers had "lost faith" in Weera, believing he had misrepresented the tax consequence of the Wedgewood investment. (*Id.*)  At this time, Rogers and Stephen retained an attorney, David Foster ("Foster").  He filed a complaint in Wayne County Circuit Court, asserting various claims, including statutory conversion and securities law violations, focusing on Weera's alleged misrepresentations and misuse of investment funds.  During discovery, Foster found that Weera withdrew the $585,000 invested by Rogers and Stephen and transferred those funds to offshore accounts.  Bank records disclosed during discovery also showed several transfers made to other individuals after Stephen's original investment of $50,000.

Foster amended the complaint in December 2017, detailing additional factual allegations regarding the funds' disposition and suggesting misuse and possible Ponzi scheme characteristics, particularly with regard to the initial $50,000 investment made by Stephen.  Foster testified in his deposition that the Ponzi scheme allegation was not substantiated due to challenging discovery issues and the settlement occurring soon after the filing of the amended complaint.  He admitted to using the term "Ponzi scheme" for its impact, despite not believing Wedgewood was in fact a Ponzi scheme.  He claimed to have used the allegations as a litigation strategy due to opposing

counsel's lack of expertise in securities law.  In February 2018, Foster filed a motion for summary disposition addressing statutory conversion, securities fraud, fraudulent misrepresentation, and legal malpractice claims.  The litigation was referred to case evaluation, resulting in a $2 million case evaluation award, which prompted settlement discussions.

In April 2018, Defendants entered into a settlement with Weera and Wedgewood for $900,000, structured as a $550,000 downpayment and a $350,000 promissory note.  The downpayment was made with three cashier's checks totaling $550,000, which were deposited into Foster's trust account and then distributed to Rogers and Stephen.  According to the Trustee's C.P.A., Wedgewood was insolvent at the time these transfers were made, and $450,000 of the downpayment came from the sale of Weera's real property, referred to as the Caledonia farm property, while $100,000 came from other investors.  However, Defendants averred (based on their belief that the funds were from Weera's overseas transfers) that they were unaware of Wedgewood's insolvency.

Post-settlement, the first $10,000 installment on the promissory note was made in May 2018 to Foster.  Foster then transferred $8,425.26 to Rogers and Stephen.  Following Weera's death in June 2018, there was a default on the monthly payments, and in July 2018, a consent judgment was entered for $350,000, less payments previously made.

Foster garnished Wedgewood's bank account, resulting in $98,063.15 being debited, part of which was retained by Foster for legal fees with the remainder distributed to Rogers and Stephen.  Neither party appears to have raised or discussed the issue of Rogers' and Stephen's knowledge regarding the garnishment except for the Bankruptcy Court, which briefly addressed the matter in a footnote that stated:

> The court questions whether the $98,063.15 transfer, which was made involuntarily pursuant to the writ of garnishment after Weera's death, should be included as a transfer made with actual intent to defraud.  The Trustee has consistently argued that it should.  The Defendants have not refuted this assertion and have not sought to distinguish this transfer based on its involuntary nature or its timing.  For this reason, the court accepts the Trustee's argument that the transfer for [*sic*] funds pursuant to the garnishment was also made with actual intent to defraud.

(*Id.* at 42, n.32.)

The timing and sufficiency of service of the writ of garnishment was at issue.  Foster personally served the garnishment at a Chemical Bank branch on August 14, 2018.  He served Shalitha Bennett, an Assistant Branch Manager, who represented to him that she was authorized to accept service.

At trial, David Schmid ("Schmid"), a bank representative,[3] testified that the bank's procedures contemplated that service of a garnishment could be done by "walk-in" at a specific branch.  (*Id.* at 26.)  He also stated that an Assistant Branch Manager, such as Bennett, would have had authority to accept service.  Schmid confirmed that the bank's internal records showed that Bennett was personally served with the garnishment on August 14, 2018.  Upon receipt of the writ, Schmid explained that the bank's procedures would have required Bennett to promptly send an electronic copy of the writ to the levy and garnishment department for processing and that the hard copy would have been forwarded via courier or inter-office delivery.  According to bank records, the garnishment department noted that it received the garnishment on August 17th.  The Bankruptcy Court found that "the evidence clearly establishes that the personal service resulted in the bank being informed of the garnishment."  (*Id.* at 63.)

On November 15, 2018, a chapter 7 petition was filed for Wedgewood, and Appellant was appointed as the chapter 7 trustee.  Rogers and Stephen filed a claim for $203,294, based on the state court Consent Judgment.  The Trustee initiated the adversary proceeding on November 6, 2020.

The Trustee estimated the unsecured claims in the chapter 7 case at a minimum of $5.46 million.  As of August 2023, the estate had $322,000 in its account and potential judgments totaling approximately $674,000, leading to a maximum possible distribution of about $996,000 to creditors, or 18% of claims.  The Trustee compared this to the amount Rogers and Stephen received from the prepetition garnishment and asserted that they received more through the garnishment than they would have as unsecured creditors.

---

[3]The Bankruptcy Court explained in a footnote why Schmid, an employee of Huntington National Bank, was qualified to testify as to Chemical Bank's garnishment procedures. (Op. at 25–26, n.18.) Schmid testified that Huntington National Bank had acquired Chemical Bank in 2020, and that Chemical Bank's procedures for accepting service of garnishment in 2018 were the same as Huntington National Bank's current procedures. (*Id.*)

The complaint sought to avoid the transfers made to Rogers, Stephen, and Foster under the state court settlement agreement and garnishment as actual fraudulent transfers under § 548(a)(1)(A) of the Bankruptcy Code and § 544(b) and the Michigan Uniform Voidable Transactions Act ("UVTA").[4]  The complaint also sought to avoid as a preference the transfer of $98,063.15 through the garnishment of Wedgewood's account at Chemical Bank.

The Trustee's C.P.A. prepared an expert report and an electronic spreadsheet summarizing her findings based on her review of bankruptcy and probate case filings, bank statements, and business records.  The Trustee's expert witness identified five instances when new investor funds were used to repay prior investors, concluding that Wedgewood operated as a Ponzi scheme.  Her report documented instances of fund diversion and commingling between May 2014 and June 2018, with twelve examples of transfers from Wedgewood's accounts to personal and business accounts and seven instances of using non-Wedgewood accounts to fund Wedgewood obligations.  Transfers to individual investors of between $5,000 and $50,000 were made during 2013, 2014, and 2015.  The Trustee's C.P.A. concluded that Wedgewood was continuously insolvent from May 1, 2012, through November 15, 2018, with assets estimated at $1,133,952.03 and liabilities at $3,650,262.52 as of May 1, 2012, resulting in an insolvency of $2,516,310.49, and continued insolvency between $2.3 million and $6.8 million during the prepetition period.

## DISCUSSION

1. **Did the Trial Court err in finding that Appellees accepted Wedgewood's actually fraudulent transfers in good faith for purposes of their affirmative defense under Section 548(c) of the Bankruptcy Code?**

The Bankruptcy Court found, and neither party disputes, that Debtor's transfers to Defendants were actually fraudulent under § 548(a)(1) and were presumptively voidable.

---

[4]The Bankruptcy Court's Opinion states that the UVTA has virtually identical requirements to those under § 548(a)(1)(B).  The Trustee has not cited any case law or developed any argument based upon the Michigan UVTA. Accordingly, any arguments for reversal based on that Michigan state law have been waived. *See Citizens Coal Council v. U.S. E.P.A.*, 447 F.3d 879, 905 (6th Cir. 2005) ("The general rule of appellate procedure is that issues not presented in an appellant's initial merits brief are waived."); *Dean v. Lane* (*In re Lane*), 604 B.R. 23, 26 (B.A.P. 6th Cir. 2019) (quoting *In re Blasingame*, 598 B.R. at 874) ("[I]t is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

The Bankruptcy Court held, on Foster's prior motion for summary judgment, that Foster, as counsel for Rogers and Stephen, was a "mere conduit" for the payments at issue and not the initial transferee.  (Op. at 64, n.47 (citing Order Granting in Part and Denying in Part Defendant David Foster's Motion for Summary Judgment, Adv. P. 20-80139-jwb, ECF No. 47)); *see generally Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988) (looking at the "entity for whose benefit" the initial transfer was made).  The parties do not dispute that conclusion in this appeal. (Appellant's Br. at 26, Case No. 24-8007, ECF No. 18 (recognizing application of § 548(c) to "'[a]n initial transferee' like Rogers and Stephen"); Appellee's Br. at 9, Case No. 24-8007, ECF No. 25 ("There is no dispute that . . . Rogers-Stephen were innocent initial transferees.").)  Thus, the affirmative defense under § 548(c) applies in this case, and not the provisions of § 550(b)(1), because Rogers and Stephen were "initial transferees" and not "immediate or mediate transferees." *See* 11 U.S.C. § 550(a)(2), (b); *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 729–30 (6th Cir. 2017) (stating the two standards).

Under § 548(c), "[a]n initial transferee is not liable for the transferred property if the transferee: (i) took the property 'in good faith'; and (ii) 'gave value to the debtor in exchange for such transfer.'" *Meoli*, 848 F.3d at 729 (quoting 11 U.S.C. § 548(c)).  Accordingly, the Bankruptcy Court conducted a good faith defense analysis under § 548(c), focusing on whether Defendants acted in good faith and gave value in exchange for the transfers.

There is no statutory definition of "good faith" in the Bankruptcy Code.  The Sixth Circuit acknowledged that "courts have 'struggled' to define good faith in this context." *Id.* at 734 (citing *First Indep. Cap. Corp. v. Merrill Lynch Bus. Fin. Servs. Inc.* (*In re First Indep. Cap. Corp.*), 181 F. App'x 524, 528 (6th Cir. 2006)).  In *Meoli*, the Sixth Circuit approved the test for good faith articulated and applied by the bankruptcy court, finding it "not erroneous." *Id.* at 734.  That "test" was stated in the form of a question: did the transferee "ever reach the point where it could no longer legitimately cling to its belief" that it was receiving transfers in good faith. *Id.*[5]

---

[5]A subsequent related case, *Huntington National Bank v. AIG Specialty Insurance Co.*, No. 23-3039, 2024 WL 374571 at \*11 (6th Cir. Feb. 1, 2024), stated: "Good faith is an affirmative defense, and its formulation—'whether Huntington legitimately continued to believe that Teleservices's transfers to Cyberco's account were merely Cyberco's receivables that Teleservices had collected'—is not tantamount to an intent to injure, malice, ill will, or other similar culpability."

In determining whether Rogers' and Stephen's good faith had ended, the Bankruptcy Court adopted the "hybrid" test of a transferee's good faith. (Op. at 46 (citing *Bash v. Textron Fin. Corp.*, 524 B.R. 745, 759 (N.D. Ohio 2015); *Tabor v. Kelly* (*In re Davis*), Bankr. No. 05-15794-GWE, Adv. No. 07-05181-L, 2011 WL 5429095, at *24 (Bankr. W.D. Tenn. 2011)).) This hybrid test "looks at the subjective intent of the transferee in light of objective factors, such as his knowledge of the presence of 'badges of fraud' or 'red flags' that should have put him on inquiry notice." (*Id.* (citing *In re Davis*, 2011 WL 5429095, at *24–25).)

*Meoli's* test for good faith would appear to apply with equal force to individual defendants, considering what the defendants knew and at what point they could not "legitimately cling to [their] belief" that they were acting in good faith. 848 F.3d at 723. Furthermore, Appellant does not dispute that the Bankruptcy Court articulated the correct standard. (Appellant's Br. at 30 ("The bankruptcy court's articulation of the good-faith standard was therefore correct as far as it goes.").) Instead, the Appellant asserts that "the bankruptcy court did not apply the standard when analyzing the legal significance of the largely, if not entirely, undisputed facts in this case." (*Id.*)

Appellant argues that the Bankruptcy Court "functionally applied a different test: one that required the Trustee to prove that Rogers, Stephen, or Foster *actually* knew that Wedgewood was a Ponzi scheme." (Appellant's Br. at 21.) In contrast, Appellant appears to argue that the presence and knowledge of *any* red flags places a person on inquiry notice and is sufficient to defeat good faith. However, the idea that bare inquiry notice is sufficient to defeat good faith was rejected by the Sixth Circuit in *Meoli*, where good faith was found to continue even after the financially sophisticated defendant grew suspicious enough to conduct an investigation.

The facts in the *Meoli* case demonstrate that the presence of red flags, even those sufficient to lead a person to investigate are not, in and of themselves, enough to defeat good faith. In that case, the bankruptcy court noted numerous red flags that preceded the point at which it determined that the defendant could no longer claim good faith, and that aspect of its decision was affirmed by the Sixth Circuit. In *Meoli*, Cyberco was a deposit and loan customer of the defendant bank. 848 F.3d at 720. Cyberco's chairman, Watson, represented that it purchased equipment from Teleservices, which was later proven to be a "paper company" created by Watson to perpetuate fraud. *Id.* One year into the bank's relationship with Cyberco, in September 2003, a $2.3 million

Teleservices check deposited by Cyberco bounced, and a bank employee, White, determined not to process the check. *Id*. at 720–21. One month later, bank employees met with Watson. *Id.* at 721. At that meeting, Watson made representations about Teleservices that conflicted with earlier information that had been provided by Watson and recorded in bank records. Had the bank employees been aware of the prior representation, it would have presented a "smoking gun." *Id.* White was still suspicious about the Cyberco account and "suspected foul play" based on Cyberco's refusal to use a lockbox, which would allow the bank to monitor Cyberco's revenues. *Id.* White continued to investigate the account. *Id.*

In January 2004, the bank asked Cyberco to find a new bank. Some employees stated they did not understand Cyberco's complex business, but others "clearly worried that Cyberco might not pay back its debt." *Id.* White's superior, Kalb, wrote at the time: "'the 'red flags' continue,' and that there was in 'recent times . . . the heightened risk of financial misinformation (as well as fraud),' and that he hoped [the bank] would not 'lose money' in the process of ending its relationship with Cyberco." *Id.* By April 2004, Kalb was even more certain there was foul play based on several factors. *Id.* Around that time, "White found proof of Cyberco's foul play," in the form of information that refuted representations that Watson had made about Cyberco's reasons for not using a lockbox and that its purported customers were in fact competitors. *Id.* at 721–22. At that point, Kalb and White alerted the bank's security department. *Id.* at 722. Meanwhile, Kalb suggested to Watson that the bank contact Cyberco's customers to verify that they were in fact customers, and Watson resisted. *Id.* The bankruptcy court, as affirmed by the Sixth Circuit, found that up to this point, the bank had received loan repayment transfers in good faith. *Id.* at 723.

It was not until April 30, 2004, long after the bounced check, when the bank's security department "discovered that Watson was a convicted fraudster," that the bank was found to have lost its ability to assert good faith. *Id.* The security department failed to communicate this information to Kalb, who was overseeing the bank's relationship with Cyberco. *Id*. The bankruptcy court found that had Kalb been provided that information, he "would have acted differently than to continue to receive the transfers from Teleservices in good faith." *Id.*

The Sixth Circuit found no error in the bankruptcy court's finding that, despite numerous "red flags" and the bank's determination that its security department should investigate Cyberco, the actual tipping point for loss of good faith did not occur until the investigation turned up Watson's fraudulent past at the end of April 2004. *Id.* at 730–31. Based on the *Meoli* case, the Appellant is misguided in arguing for an approach that effectively terminates good faith at the first sign of a red flag.

Likewise, we find no error in the Bankruptcy Court's finding that Rogers and Stephen received the settlement transfers in good faith despite their limited awareness of some red flags.

The Bankruptcy Court's factual determinations are reviewed under a clearly erroneous standard. The *Meoli* decision makes it clear that where, as in the present case, the transferees (Rogers and Stephen) established that their initial dealings with Weera and Wedgewood were in good faith and without notice, that "good faith" continues until the initial transferees obtained some definite piece of information demonstrating that the transferees "could no longer legitimately cling to [their] belief" that they were no longer acting in good faith. *Id.* at 734. Payments received thereafter would be avoidable. *See id.* at 730 (approving recovery of all payments made after good faith had ended).

The trial court found "that Rogers acted in good faith. She was not complicit in Weera's fraud and was not aware of any red flags when she made her investment. When red flags came up after her investment in Wedgewood, they pointed to Weera's ineptitude and lack of follow-through, but not to a broader fraudulent scheme." (Op. at 49.) Moreover, the Bankruptcy Court held: "The case for good faith is even stronger for Stephen, whose lack of direct communication with Weera and general inability to understand or recall the financial transactions at issue makes it nearly impossible to charge him with knowledge of fraud or potential red flags." (*Id.* at 50.)

Rogers and Stephen were elderly individuals with little financial or legal experience. There is no evidence that they should have known or understood the potential legal implications of what little knowledge they had. Their limited knowledge of red flags and the concept of inquiry notice do not compel the conclusion that Rogers and Stephen did not act in good faith. In *Meoli* and

cases cited therein, sophisticated business entities with knowledge of red flags were still found to have acted in good faith.

The Bankruptcy Court made factual findings that Rogers and Stephen acted in good faith. (Op. at 46–50.)  Appellant has failed to show that these factual findings are "clearly erroneous"; therefore, there is no reversible error in these findings of good faith.

The remaining issue relating to good faith is Appellant's contention that the Bankruptcy Court's findings related to Foster constitute reversible error.  The Bankruptcy Court reviewed Michigan law regarding the imputation of knowledge to an attorney's client:

> Under Michigan law, it is generally held that "where a client is represented by an attorney, knowledge acquired by the attorney while acting within the scope of his authority is by fiction of law the knowledge of the client." *Katz v. Kowalsky*, 296 Mich. 164, 170, 295 N.W. 600, 603 (1941); *see also* Restatement (Third) of Agency, § 5.03 (2006).

(Op. at 50–51.)

The specific factual issue is captured by the Bankruptcy Court's assertion: "Whatever Attorney Foster may have suspected about Wedgewood's operations, there is no evidence that he knew it was a Ponzi scheme.  Under the circumstances, there is no actual knowledge of the scheme that can be imputed to the Defendants to undermine the court's previous determination that they accepted the transfers from Wedgewood in good faith." (*Id.* at 54.)

Foster's testimony was presented in the form of deposition testimony.  The clearly erroneous standard applies with equal force to a trial court's findings made based upon transcripts or deposition testimony. *Guerrero v. United States*, 383 F.3d 409, 414–16 (6th Cir. 2004); *see also McFarland v. T.E. Mercer Trucking Co.*, 781 F.2d 1146, 1148 (5th Cir. 1986) (discussing the then-recent amendment to Federal Rule of Civil Procedure 52(a) and stating: "The findings of fact by the trial court based on deposition evidence are entitled to the same [clearly erroneous] standard of review that they would receive if based on oral, in-court testimony."); *accord Anderson*, 470 U.S. at 574 (holding that the clearly erroneous standard applies "even when the district court's

findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts").[6]

The Trustee lists all of the facts, statements and pleadings that would support a finding of inquiry notice on the part of Foster that, in turn, should be—in his view—attributed to Rogers and Stephen. (*See* Appellant's Br. at 32–41.)

Notably, most of the information known to Foster that suggested the potential of a Ponzi scheme was related to the first $50,000 invested by Stephen in February 2013. There is far less evidence regarding the later, larger investments made by Stephen in March 2016, and the investments by Stephen and Rogers in April 2016. In presenting his case, it appears that the Trustee chose to argue that all of the investments were avoidable rather than separating the original $50,000 investment, for which there was more evidence that it was used as part of a Ponzi scheme.[7] The Bankruptcy Court considered the case as it was presented and did not separately consider each individual investment.

Foster had enough facts to lead him to include a Ponzi scheme claim in the amended complaint he filed, and he sought additional discovery on that issue. Nevertheless, the Bankruptcy Court considered and credited Foster's assertion that he only threw in the Ponzi scheme claim as a litigation tactic and that his primary concern was that Weera had stolen Rogers' and Stephen's money and transferred it overseas.

In considering whether Foster's limited knowledge was sufficient to tip the scale to a loss of good faith, the Bankruptcy Court also considered what it actually took for persons or entities with more information to discover Weera and Wedgewood's fraud.

---

[6]Although it does not appear to affect the standard of review, it should be noted that the Bankruptcy Court also took live testimony on the same set of facts and reviewed the deposition of Foster in the light of that live testimony.

[7]As the Supreme Court has recently emphasized, courts should decide issues under the "party presentation principle." *See United States v. Sineneng-Smith*, 590 U.S. 371, 376, 140 S. Ct. 1575, 1579 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation. As this Court stated in *Greenlaw v. United States*, 554 U.S. 237, 128 S. Ct. 2559, 171 L.Ed.2d 399 (2008), 'in both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.' *Id.* at 243, 128 S. Ct. 2559."); *Clark v. Sweeney*, 607 U.S. 7, 9, 146 S. Ct. 410, 412 (2025) (citing *Sineneng-Smith*).

First, the Bankruptcy Court cited the facts associated with the involvement of LARA and the actions it took against Weera and Wedgewood.[8] This state agency issued a cease-and-desist order against Weera and Wedgewood in March 2016 but did not put them out of business or prosecute them criminally for their actions in soliciting investments. Clearly, LARA had facts that would cause an investigation—similar to the "inquiry notice" the Trustee asserts was sufficient to end Foster's good faith. Presumably, LARA, as a state regulatory agency, has some sophistication in the investment area it regulates. Yet, it does not appear that LARA discovered sufficient evidence to treat Weera and Wedgewood as operators of a Ponzi scheme. The investments were found to be improper, but it is doubtful that the relatively mild penalties that Weera and Wedgewood received would have been the response if LARA had uncovered a Ponzi scheme.

Second, the Bankruptcy Court had the opportunity to consider testimony from the Trustee's expert, who did uncover the Ponzi scheme and documented it. In hearing that testimony, the Bankruptcy Court had information about what efforts it actually took to bring to light proof of the fraudulent scheme that LARA had failed to uncover.

Thus, the Bankruptcy Court was able to view the deposition testimony of Foster in the context of, and in comparison with, a governmental licensing and regulatory agency that did not discover the Ponzi scheme and a forensic accountant who did.

The Bankruptcy Court found that "[w]hatever Attorney Foster may have suspected about Wedgewood's operations, there is no evidence that he knew it was a Ponzi scheme." (Op. at 54.) Although the Bankruptcy Court used language suggestive of a requirement of actual knowledge, that is not consistent with the Bankruptcy Court's review or treatment of the evidence. Nor is the finding clearly erroneous in light of the comparison of Foster's knowledge with that of the bank in *Meoli*.

Moreover, the structure of the Opinion deserves attention. The sequencing of the analysis—starting with Rogers and Foster's intertwined awareness and moving to the independent good faith analysis of Foster—suggests that the red flags and inquiry notice issues were

---

[8]Notably, this investigation was after the original $50,000 investment by Stephen discussed above.

methodically considered by the Bankruptcy Court.  While we might question whether we would have made the same decision, we do not find that the decision finding good faith is "clear error" requiring reversal.

The Appellant's arguments are primarily based upon case law from other jurisdictions that take a different approach to the good faith requirement in § 548(c).  Those cases generally either apply an "objective" test or a more judicial, rules-based approach to determining good faith.  In contrast, the *Meoli* decision adopts the "hybrid" and "holistic" side of the ongoing legal debate on good faith.  Thus, Appellant's argument fails because courts in the Sixth Circuit are bound by Sixth Circuit binding precedent, not precedent from other circuits. *See Baynes v. Cleland*, 799 F.3d 600, 616–17 (6th Cir. 2015) (citing cases for the proposition that only an *en banc* court may overrule a circuit precedent, absent an intervening Supreme Court decision); *see also In re Miedzianowski*, 735 F.3d 383, 384 (6th Cir. 2013) (rejecting the argument that a "circuit split" is to be considered where the Sixth Circuit has, itself, ruled on the issue: "Where our circuit has answered the question, the district court is bound by our published authority.").  In keeping with those precedents, we see our role as applying *Meoli*, not attempting to distinguish it.

The Trustee emphasizes the negative impact that allowing the good faith defense for Rogers and Stephen has on other creditors in the underlying chapter 7 case, i.e., that giving priority to two creditors disadvantages similarly situated creditors who are equally blameless.  This situation is not an unfamiliar one to bankruptcy judges, who regularly deal with priority issues that have the same dynamic.  Yes, other parties will receive less because Stephen and Rogers received more.  But that is inherent in the statutory exception to recovery set forth in § 548(c), and thus, criticism of that disparity is properly addressed to the legislature.  The court cannot simply ignore the statute on equitable grounds because of the consequences that are inherent in the Bankruptcy Code provision. *Cf.*, *Law v. Siegel*, 571 U.S. 415, 427, 134 S. Ct. 1188, 1198 (2014) ("[I]t is not for the courts to alter the balance struck by the statute.").

Accordingly, the Panel finds that the Bankruptcy Court did not err in finding that Appellees accepted Wedgewood's actual fraudulent transfers in good faith for purposes of their affirmative defense under § 548(c) of the Bankruptcy Code.

**2. Did the Bankruptcy Court err when it held that Michigan's court rule regarding dismissal of improperly served complaints meant that the garnishment was deemed to have been served outside the preference period?**

"Under 11 U.S.C. § 547(b), a bankruptcy 'trustee may . . . avoid' preferential transfers— 'transfer[s] of an interest of the debtor in property' that satisfy the five requirements listed in § 547(b)." *Hooker v. Wanigas Credit Union*, 835 F. App'x 110, 111 (6th Cir. 2021) (citing 11 U.S.C. § 547(b)). Here, the sole issue on appeal is whether the transfer occurred during the 90-day preference period for purposes of § 547(b)(4).

Federal law controls "[w]hat constitutes a transfer and when it is complete." *Barnhill v. Johnson*, 503 U.S. 393, 397, 112 S. Ct. 1386, 1389 (1992). The term "transfer" is defined in the Bankruptcy Code and, for purposes of the issues before the Panel, includes "the creation of a lien." 11 U.S.C. § 101(54)(A). A transfer is generally deemed to have been made "at the time such transfer is perfected." 11 U.S.C. § 547(e)(2)(B). Perfection occurs "when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." *Id.* § 547(e)(1)(B); *see also Fidelity Fin. Servs., Inc. v. Fink*, 522 U.S. 211, 216, 118 S. Ct. 651, 652 (1998) ("[A] transfer is "perfected" only when the secured party has done all the acts required to perfect its interest. . . ."). "A more precise definition of 'perfection' is left to state law." *Battery One-Stop, Ltd. v. Atari Corp.* (*In re Battery One-Stop, Ltd.*), 36 F.3d 493, 495 (6th Cir. 1994).

From a broader federal perspective, the majority rule among the circuit courts, including this circuit, has been that when a bank account is garnished, a transfer occurs "upon service of the garnishment order and notice on the garnishee bank." *Id.* at 498 (holding that a transfer of garnished funds under Ohio law is perfected upon service of the garnishment order because that action "binds" the funds and, after that time, no other creditor can acquire a superior lien in the funds); *Phillips v. MBank Waco, N.A.* (*In re Latham*), 823 F.2d 108, 110 (5th Cir. 1987) (interpreting Texas law); *Walutes v. Baltimore Rigging Co.*, 390 F.2d 350 (4th Cir. 1968) (interpreting Maryland law as it applied to Section 60 of the Bankruptcy Act).[9] The questions in

---

[9]*But see Freedom Grp., Inc. v. Lapham-Hickey Steel Corp.* (*In re Freedom Grp., Inc.*), 50 F.3d 408, 412 (7th Cir. 1995) (adopting the minority approach that transfer occurs not upon service and notice of a garnishment but instead upon later entry of a "final order of attachment" that directs payment of the funds to the creditor).

this case are 1) was "service" of the garnishment order effected when the manner of service was not strictly compliant with the requirements set forth in the Michigan Court Rules and 2) when did such service occur?

"Michigan follows the general rule that a garnishment lien attaches upon service of the writ." *Mich. Tractor & Mach. Co. v. Elsey*, 216 Mich. App. 94, 97, 549 N.W.2d 27, 29 (1996) (quoting *Mary v. Lewis*, 399 Mich. 401, 411, 249 N.W.2d 102 (1976)); *see also Bleau v. First of Am. Bank-Cent.* (*In re Arnold*), 132 B.R. 13, 14–15 (Bankr. E.D. Mich. 1991) ("[A] post-judgment lien is perfected when the writ is served," and the first perfected would have priority.); *In re Collier*, No. 22-30274-JDA, 2022 WL 2357087, at *2 (Bankr. E.D. Mich. June 29, 2022) (holding that a perfected lien arose from tax refund garnishment "[a]t the time the writ was served"); *In re Piccard*, No. 18-22427-DOB, 2021 WL 1134793, at *5 (Bankr. E.D. Mich. Mar. 24, 2021) ("A garnishment is perfected when the notice is served.").

The facts underlying the transfer are not in dispute. Instead, this issue turns on an interpretation of Michigan law—the interaction of Michigan's garnishment statutes and the requirements of the Michigan Court Rules—to determine when the transfer occurred for preference purposes under § 547(b).[10] *See Barnhill*, 503 U.S. at 398 ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."); *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved

---

[10]When a *periodic* garnishment (typically a wage garnishment) has been filed outside the preference period, but wages are taken by the creditor as they are earned (during the preference period), the majority of recent court decisions have rejected the conclusion that service of the wage garnishment outside of the preference period defeats the preference claim. *See, e.g.*, *Weinman v. Alt. Revenue Sys., Inc.* (*In re Stevens*), 552 B.R. 773, 777 (Bankr. D. Colo. 2016) (relying on *Local Loan Co. v. Hunt*, 292 U.S. 234, 243, 54 S. Ct. 695, 698 (1934) ("The earning power of an individual is the power to create property; but it is not translated into property within the meaning of the Bankruptcy Act until it has brought earnings into existence.")); *In re Johnson*, 239 B.R. 416, 417–18 (Bankr. M.D. Ala. 1999) (rejecting the "continuing lien" theory of wage garnishments because a debtor "acquired rights in the property transferred on the day he became entitled to his wages" (citation omitted)). These cases concerning continuing wage garnishments are not persuasive because they focus on the fact that the property being transferred (i.e., wages) did not exist at the time the original garnishment was filed. *See* 11 U.S.C. § 547(e)(3) ("For the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred."). That is not the case here because all the garnished funds were in the Chemical Bank account at the time the garnishment was served.

in a bankruptcy proceeding.").**11**   The proper interpretation of Michigan law, and the application of that law to the undisputed facts, is subject to *de novo* review. *Liable v. Lanter*, 91 F.4th 438, 442 (6th Cir. 2024) (citing *Dolan v. United States*, 514 F.3d 587, 593 (6th Cir. 2008)).

In deciding an issue of state law that has not been directly addressed by the state's supreme court, the Panel must predict "how that court would rule if it were faced with the issue." *See United States v. Simpson*, 520 F.3d 531, 535 (6th Cir. 2008); *Kingsley Assoc., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995) ("Since the Michigan Supreme Court has not addressed this issue, however, we must predict how it would resolve the issue from 'all relevant data.'"). Relevant data includes the state's appellate court decisions, as well as "the state's supreme court *dicta*, restatements of law, law review commentaries, and the majority rule among other states." *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995)); *Drown v. Perfect* (*In re Giaimo*), 440 B.R. 761, 769 (B.A.P. 6th Cir. 2010).

Michigan Court Rule ("MCR") 3.101(F)(1) states that garnishments should be served: "in the manner provided for service of a summons and complaint in MCR 2.105."   MCR 2.105(D) addresses service on a corporation:

> (D) Private Corporations, Domestic and Foreign. Service of process on a domestic or foreign corporation may be made by
>
> > (1)   serving a summons and a copy of the complaint on an officer or the resident agent;
> >
> > (2)   serving a summons and a copy of the complaint on a director, trustee, or person in charge of an office or business establishment of the corporation and sending a summons and a copy of the complaint by registered mail, addressed to the principal office of the corporation;

MCR 2.105(D).

---

**11**A separate legal framework, dealing with the specific issue of deficient service of a garnishment followed by waiver, has gained some support in the bankruptcy courts.  Some courts have held that although proper service creates a valid judicial lien sufficient as a transfer for preference purposes, when service is not proper, no transfer occurs until the party to be served waives an objection to improper service.  *See e.g.*, *Albert v. Chesapeake Bank & Tr. Co.* (*In re Linton Props., LLC*), 410 B.R. 1, 15–18 (Bankr. D.D.C. 2009) (interpreting Maryland Law); *Pa. Cap. Bank v. Glosser* (*In re Allen*), 228 B.R. 115, 128–29 (Bankr. W.D. Pa. 1998) (interpreting Kentucky and Pennsylvania law).  To the extent these cases rely on state law, Michigan law does not appear to support the "waiver" approach.

Here, Foster testified that he hand-delivered the writ of garnishment to Shalitha Bennett at a Chemical Bank branch on August 14, 2018. (Op. at 63.) This was confirmed by the bank's own records. Ms. Bennett was the branch manager, not an officer or resident agent of the Bank. Accordingly, subsection (2) of MCR 2.105(D) applies to service. Foster, however, did not take the second step required by that subsection and send a copy of the writ of garnishment to Chemical Bank's principal office via registered mail.[12] This act was never performed, but Appellant does not argue that service never occurred. He argues service was effective on August 17, rather than August 14.

It is undisputed that Foster did not strictly comply with the service statute. Based on that circumstance, the Bankruptcy Court examined at what point the service became effective. The Bankruptcy Court considered the additional facts that "Chemical Bank's garnishee disclosure, prepared on August 21, 2018, states that the bank received the writ on August 17, which is the date that the bank's garnishment department received the writ." However, a bank representative testified that according to bank policy, the writ should have been considered received as of August 14 when the bank's internal records showed that the branch manager received the writ, not the date that the garnishment made its way to the garnishment department.

Because Michigan Court Rules applicable to the service of a summons and complaint apply to the method of serving a garnishment, the Bankruptcy Court applied another Michigan Court Rule addressing the effect of imperfect service. MCR 2.105(K)(3) provides: "An action shall not be dismissed for improper service of process unless the service failed to inform the defendant of the action within the time provided in these rules for service." No party has asserted that the service by Foster failed "to inform defendant of the action within the time provided in these rules for service." The Bankruptcy Court expressly found that the defect of failing to follow up on the personal service "by sending a copy of the writ by registered mail to the bank's principal office

---

**12** No party has raised an issue of constitutional due process. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 657 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). Service here provided actual notice and appears to have been calculated to do so. The issue before the Panel is the narrower question of the effect of non-compliance with the service requirements of the Michigan Court Rules on the question of when the "transfer" occurred for preference purposes.

. . . does not render the personal service ineffective *because the evidence clearly establishes that the personal service resulted in the bank being informed of the garnishment*." (Op. at 63 (emphasis added).)  The Bankruptcy Court essentially applied an actual notice standard, which was not erroneous based on a review of additional Michigan case law and the garnishment statutes themselves.[13]

In Michigan, there are two types of garnishments: periodic and non-periodic.  Michigan statutes ("MCLA") treat periodic and non-periodic garnishments differently in terms of the effect of insufficient service.  MCLA § 600.4011 applies to garnishments generally, and § 600.4012 applies only to periodic garnishments.

The periodic garnishment statute (which would apply to wage garnishments) provides:  "A garnishment of periodic payments or a notice of failure is not valid or enforceable unless the garnishment is served on the garnishee in accordance with the Michigan court rules."  MCLA § 600.4012(4).[14]  It further provides that on timely motion of the garnishee after entry of a default judgment, the court shall set aside the default judgment if, among other reasons, the garnishment "was not properly served or sent as required by this section."  MCLA § 600.4012(10)(b)(ii). However, there are no corresponding statutory provisions mandating strictly compliant service for non-periodic garnishments.

While the failure to strictly comply with the requirements of MCR 2.105(D) would appear to be fatal when a creditor seeks to enforce a periodic garnishment, there is support in the Michigan

---

[13]Appellant cites to *Sutton v. Mountain High Investments, LLC*, No. 21-1346, 2022 WL 1090926, at *2 (6th Cir. Mar. 1, 2022), which held that improper service under MCR 2.105(D) did not trigger the start of the 30-day removal period. (Appellant's Br. at 44–45.)  Appellant argues that *Sutton* stands for the proposition that MCR 2.105(K)(3) precludes dismissal for improper service of process but does not make the improper service immediately effective. (*Id.*)  But the Panel does not find this to be persuasive in light of more specific cases addressing the sufficiency of actual notice for service of non-periodic garnishments.  Moreover, Appellant admits: "if Chemical Bank had moved to dismiss the garnishment proceeding on the basis of improper service, it probably would have lost; after all, it received notice." (*Id.* at 45.)

[14]"Actual notice" of a *periodic* garnishment was held not to be sufficient in *Ally Financial, Inc. v. Ellis*, No. 332408, 2017 WL 4654556, at *4 (Mich. Ct. App. Oct. 17, 2017), where the garnishment was not properly served. The court noted that MCLA § 600.4012(10)(b)(ii) "expressly provides that the court shall set aside the default judgment if the garnishment, notice of failure, request for entry of a default, or request for default judgment was not properly served or sent[,and it] does not provide any exception in the case of the garnishee having actual notice of the garnishment." *Id.*

case law for finding non-compliant service to be sufficient when—as here—the creditor sought a non-periodic garnishment and the garnishee had actual notice.

Most notably, in a case involving a bankruptcy case filed under the Bankruptcy Act, the Michigan Supreme Court stated:

> Michigan follows the general rule that a garnishment lien attaches upon service of the writ. *Kyte v. MacIvor*, 266 Mich. 258, 253 N.W. 289 (1934); *Rickman v. Rickman*, 180 Mich. 224, 146 N.W. 609 (1914). In the case of a prejudgment garnishment, the entry of a judgment in favor of the plaintiff perfects the lien acquired upon service by removing its inchoate status and establishing the exact amount of the debt owed by the principal defendant and, thus, the amount for which the garnishee may be held liable. Should the plaintiff fail to obtain a judgment, the lien would be discharged.

*Mary*, 399 Mich. at 411, 249 N.W.2d at 106. This suggests that under Michigan law, a lien arises upon service of the garnishment, even if it is subject to later defeasance.

Further, in *McKnight v. General Retirement System of City of Detroit*, Nos. 290261 & 293215, 2010 WL 4628654, at *7 (Mich. Ct. App. Nov. 16, 2010), the court determined that a non-periodic writ of garnishment had been properly served, but went on to say in *dicta*:

> The rules governing service of process "are intended to satisfy the due process requirement that a defendant be informed of the pendency of an action by the best means available, by methods reasonably calculated to give a defendant actual notice of the proceeding and an opportunity to be heard and to present objections or defenses." Even if [the plaintiff] did not properly effectuate service in accordance with the court rule, such a failure is not construed to be fatal, as "[a]n action shall not be dismissed for improper service of process unless the service failed to inform the defendant of the action within the time provided in these rules for service." [MCR 2.105(J)(3) (now numbered 2.105(K)(3)).] The record adequately demonstrates that Chase Bank had notice of the garnishment action having contacted the Retirement System within three days of receipt of the writ. Any technical defect that may have existed in the manner of service cannot be equated to a complete failure of service and would not justify the setting aside of the default judgment on that basis.

*Id.* (citation modified).

In a similar federal court decision, *Laborers Pension Trust Fund Detroit & Vicinity v. H & H Constructors, Inc.*, No. 05-CV-71995, 2007 WL 1880720, at *4–5 (E.D. Mich. June 29, 2007),

the garnishee for a non-periodic writ argued that the plaintiff had not technically complied with MCR 2.105(G)(5) for service on a school district.  The District Court held that when actual notice was achieved, technical noncompliance with the service rules was not a basis to set aside the subsequent default and default judgment, even though improper service of the writ was one of the grounds raised.  The *Laborers Pension* court explained:

> HVS maintains that the garnishment was improperly served, pointing out that the receipt indicates that the writ was sent via certified mail and was signed for by . . . a receptionist at HVS.  HVS further argues that the file does not indicate that the writ was addressed to HVS's president, secretary, or treasurer.
>
> Plaintiffs respond that HVS was aware of their claims even before the instigation of the instant lawsuit, through Notices of Supplying Labor. . . .  Plaintiff argues that HVS admits in its brief that it received actual notice of the lawsuit.  Plaintiff points out that . . . HVS's accounting coordinator[] penned a letter, as part of HVS's tardy garnishment disclosure, that acknowledged the reception of the writ of garnishment.
>
> Under Michigan law, "[i]f the improper manner of service satisfies due process by giving sufficient notice of the claim, dismissal is not warranted.  Thus, if defendant ha[s] timely and actual notice of the action, service [i]s sufficient." *Eckerson v. Mich. Dep't of Transp.*, No. 174747, 1996 WL 33349436, \*2 (Mich. Ct. App. Oct. 11, 1996) (applying this principle to MCR 2.105(G)); *see Ibrahiem v. City of Flint*, No. 06-10940, 2006 WL 3759920, \*2 (E.D. Mich. Dec. 20, 2006) (holding that where the city acknowledged that its agent received the summons and complaint, the city has been provided "actual notice of the suit").
>
> Here, HVS admits that it received the garnishment writ. Furthermore, HVS submits a letter written by its accounting coordinator acknowledging the reception of the writ of garnishment and its referral to HVS's attorney.  Furthermore, MCR 2.105(G) provides that service to a school district can include individuals with "substantially the same duties [as president, secretary, and treasurer] . . . irrespective of title."  Given this evidence, Plaintiffs have shown that HVS received actual notice of the writ of garnishment. *See* MCR 2.105(J)(3) ("An action shall not be dismissed for improper service of process unless the service failed to inform the defendant of the action within the time provided in these rules for service.").
>
> Therefore, the Court does not accept Defendant's argument that it did not receive actual notice of the garnishment.

*Id.* (citation modified).  Both *McKnight* and *Laborers Pension* relied in part on MCR 2.105(K)(3), previously numbered MCR 2.105(J)(3).

After the commencement of this appeal, the Michigan Supreme Court decided *Hairston v. LKU*, ___ Mich. ___, ___ N.W.3d ___, No. 166473, 2025 WL 1014229, at *1 (Mich. Apr. 4, 2025), which interpreted the statute at issue here (MCLA § 600.4011 governing non-periodic garnishments) and MCR 3.101, which "defines the assets that can be obtained through a garnishment proceeding." As noted above, MCR 3.101(F)(1) requires that service be "in the manner provided for service of a summons and complaint in MCR 2.105." In *Hairston*, the Michigan Supreme Court stated:

> Thus, although MCL 600.4011(2) "provides the authority for the circuit court to exercise garnishment jurisdiction, the court must do so within the parameters established in the Michigan Court Rules." *Royal York of Plymouth Ass'n v Coldwell Banker Schweitzer Real Estate Servs.*, 201 Mich App 301, 305, 506 N.W.2d 279 (1993).

*Hairston*, 2025 WL 1014229, at *4. The *Hairston* court further stated that "[g]arnishment statutes are to be strictly construed." *Id.* at *6 (citing *Krakowsky v. Margolis*, 255 Mich. 3, 5, 237 N.W. 28, 28 (Mich. 1931)).

The Michigan Supreme Court's holding that courts are required to strictly construe both the garnishment statutes and the Michigan Court Rules does not expressly address the question this Panel must resolve. Although MCR 2.105(D) states how service is to be made on a corporation, which was not fully accomplished, MCR 2.105(K)(3) uses mandatory language when it directs that "[a]n action shall not be dismissed for improper service of process unless the service failed to inform the defendant of the action within the time provided in these rules for service."

Although MCLA § 600.4012(4) and MCR 2.105(D) might lead to a different result for a periodic garnishment, strict construction of MCLA § 600.4011 with MCR 2.105(D) and (K)(3) lead the Panel to conclude that the Bankruptcy Court properly analyzed the Michigan statutory and rule framework to conclude that service of the non-periodic writ of garnishment on Chemical Bank was sufficient to provide the bank actual knowledge of the writ, precluding the bank from seeking to invalidate the writ based on improper service. *See* MCR 2.105(K)(3). Thus, because "Michigan follows the general rule that a garnishment lien attaches upon service of the writ," *Mary*, 399 Mich. at 411, 249 N.W.2d at 106, Foster's service of the garnishment "on the person in charge of an office or business establishment of the corporation" created a "lien" for purposes of

§ 101(54)(A) and thus a "transfer" for preference purposes. That is, Rogers and Stephen acquired an interest that could not be primed by a subsequent intervening creditor because under the MCR, the garnishment lien was perfected outside the preference period (i.e., the writ had been served and could not be invalidated for improper service). MCR 2.105(K)(3). Accordingly, the service of the writ was sufficient to provide actual notice, putting Rogers and Stephen in a better position than similarly situated unsecured creditors. This improvement in their position, as creditors, is a key part of § 547(b)'s "test" to determine whether a transfer is preferential. *See* 11 U.S.C. § 547(b)(5). Because the writ was for a non-periodic garnishment pursuant to MCLA § 600.4011 and service was sufficient to give actual knowledge to the garnishee under MCR 2.105(D) and (K)(3) on a date prior to the preference period, the subsequent receipt of garnished funds within the preference period did not meet the statutory requirements of an avoidable preferential transfer.

Accordingly, based on Sixth Circuit precedent in *In re Battery One-Stop* and Michigan statutes, court rules, and case law, the Panel will affirm the Bankruptcy Court's ruling that the transfer made pursuant to the garnishment of Wedgewood's bank account was outside the preference period.

## CONCLUSION

The Bankruptcy Court's finding that Appellees received the transfers at issue in good faith for purposes of their affirmative defense under § 548(c) is not clearly erroneous and is AFFIRMED.

The Bankruptcy Court's holding that the garnishment of the Wedgewood bank account was outside the preference period and not avoidable is AFFIRMED.

---

**OPINION**

---

GUSTAFSON, Bankruptcy Appellate Panel Judge.   I write separately to respectfully suggest that the distinction between the criteria used to determine good faith under Sections 548(c) and 550(b)(1) is not fixedly partitioned into separate categories of analysis.  In my view, "good faith" is the larger category, and the additional language in § 550(b)(1) that a subsequent transferee must also take "without knowledge of the voidability of the transfer" may be "surplusage" or merely illustrative, rather than a wholly separate standard. *See* 5 Collier on Bankruptcy ¶ 550.03[3] (16th ed. 2026); *Picard v. Citibank, N.A.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 12 F.4th 171, 188–92, 199 (2d Cir. 2021) (agreeing with Collier that the same standard applies for § 548(c) and § 550(b)(1)); *see also* Peter Spero, *Fraudulent Transfers, Prebankruptcy Planning and Exemptions* § 4:16 (2025).  Thus, the application of an "inquiry notice" standard to the good faith requirements under § 548(c) and § 550(b)(1) would also appear to be, at least, closely related.

In the Sixth Circuit, the case law addressing the continuity between § 548(c) and § 550(b)(1) is, admittedly, somewhat less clear.  In *Teleservices*,[1] the bankruptcy court's lengthy discussion concluded that § 550(b)(1)'s additional "without knowledge" element is essentially redundant, offering no substantive distinction from good faith under § 548(c). *Teleservices*, 444 B.R. at 831–35.  In addressing the bankruptcy court's holding, the *Meoli* court stated: "The bankruptcy court cited legislative history to conclude, as other courts have, that the without-knowledge-of-voidability requirement is the same as the good-faith requirement." *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 734 (6th Cir. 2017).  While acknowledging the *Teleservices* holding, "as other courts have," *Meoli* does not appear to explicitly adopt the *Teleservices* analysis that the test for good faith is the same under both statutes. *Id.*  Nor does *Meoli* reject or criticize the *Teleservices* analysis on this point.

---

[1]*Meoli v. Huntington Nat'l Bank* (*In re Teleservices Grp., Inc.*), 444 B.R. 767 (Bankr. W.D. Mich. 2011), *aff'd in part*, 848 F.3d 716 (6th Cir. 2017).

In addressing the present case, the unanimous Panel decision limits its focus to § 548(c) and the portions of *Meoli* decided under § 548(c).  While I view those arguments as sufficient, I think that *Meoli*'s holdings under § 550(b)(1), and the two appellate cases[2] decided under § 550(b)(1) that form the foundation for the *Meoli* decision, are relevant to the issues presented here.  Because I hold this view, there are two points that I would add to those discussed in the Panel's decision.

First, while the Bankruptcy Court undertook *Meoli*'s "holistic analysis,"[3] the decision did not cite or discuss the specific questions relating to inquiry notice that *Meoli* "encouraged" courts to use: "What a reasonable person would be alerted to depends not just on whether there was inquiry notice, but also on what investigative avenues existed, whether a reasonable person would have undertaken those avenues given the situation, and what findings the reasonable investigations would have yielded.  Taken together, *Nordic Village* and *First Independence* encourage these inquiries." *Meoli*, 848 F.3d at 733.  I do not believe this guidance should be confined solely to § 550(b)(1) cases.[4]

The questions *Meoli* encouraged were not cited or systematically addressed by the Bankruptcy Court.  Instead, the decision cited to pre-*Meoli* cases which articulated a somewhat different standard.[5]  Directly addressing the specific inquiries encouraged by *Meoli* would have been, in my view, the better practice and helpful in appellate review.  However, the specific findings in the Bankruptcy Court's decision and its holistic review of the facts support affirmance.

---

[2]*IRS v. Nordic Village, Inc.* (*In re Nordic Village, Inc.*), 915 F.2d 1049 (6th Cir. 1990), rev'd on other grounds, *United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S. Ct. 1011 (1992); *First Independence Capital Corp. v. Merrill Lynch Bus. Fin. Servs. Inc.* (*In re First Independence Capital Corp.*), 181 F. App'x 524 (6th Cir. 2006).

[3]As *Meoli* states: "Taken together, *Nordic Village* and *First Independence* invite a holistic factual determination of whether a reasonable person, given the available information, would have been alerted to a transfer's voidability." *Meoli*, 848 F.3d at 733.  This holistic approach is applicable to inquiry notice under both § 550(b)(1) and § 548(c).

[4]The decision in *Wedgewood* also quotes from *Jobin v. McKay* (*In re M & L Business Machine Co.*), 84 F.3d 1330, 1338 (10th Cir. 1996), stating: "Under this standard, a recipient will lack good faith 'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose' for making the transfer." (Op. at 44.)  In my view, the specific questions suggested by *Meoli* serve to elucidate what a "diligent inquiry" would be in the specific circumstances faced by the defendants.

[5]The Bankruptcy Court cited *Bash v. Textron Financial Corp.*, 524 B.R. 745, 759 (N.D. Ohio 2015), and *Tabor v. Kelly* (*In re Davis*), 2011 WL 5429095 (Bankr. W.D. Tenn. 2011), both of which pre-date *Meoli*.

Nevertheless, in my view, an "encouraged" set of inquiries, stated in a published Sixth Circuit decision, should be addressed in some manner in future cases that deal with these issues.

Second, it is my position that the two Sixth Circuit decisions that *Meoli* relied upon provide further support for affirmance of the Bankruptcy Court's decision, even though they are cases decided under § 550(b)(1). *See Nordic Village*, 915 F.2d at 1056; *First Independence*, 181 F. App'x at 526. The holdings of these two cases, to the extent endorsed by *Meoli*, reflect additional examples where good faith defenses were discussed in the context of defendants who were sophisticated parties[6] and had been made aware of "red flags." Notably, good faith was found in *First Independence* even in the face of Michigan state law that created a "duty of inquiry" on the bank defendant. 181 F. App'x at 528. Further, there was "a range of legitimate scenarios" in *First Independence*, which *Meoli* held was sufficient to distinguish it from *Nordic Village*. *Meoli*, 848 F.3d at 733–34. The *Wedgewood* decision reviewed the potential "scenarios" asserted by the parties and found legitimacy in Appellee's position. I would affirm on these additional grounds.

---

[6]As noted in the full Panel's decision, Defendants Rogers and Stephen were not sophisticated parties.